IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

DANNY BEESON,

                   Plaintiff,                                CV-09-1403-ST

      v.                                     FINDINGS AND
                                                    RECOMMENDATION

MICHAEL ASTRUE, Commissioner, Social
Security Administration,

                         Defendant.

STEWART, Magistrate Judge:

### <u>INTRODUCTION</u>

Plaintiff, Danny Beeson ("Beeson"), brings this action pursuant to the Social Security Act

("the Act"), 42 USC § 405(g), to obtain judicial review of a final decision of the Commissioner

of the Social Security Administration ("the Commissioner").  The Commissioner denied

Beeson's application for Supplemental Security Income ("SSI") under Title XVI of the Social

Security Act ("SSA"), 42 USC §§ 401-33.  For the reasons set forth below, the Commissioner's

decision should be affirmed.

## ADMINISTRATIVE HISTORY

Beeson applied for SSI on October 11, 2005, alleging a disability since January 19, 2002,

due to heart and liver ailments, back and neck pain, depression and anxiety, and prostrate and

thyroid problems.  Tr.  60-72.[1]  His application was denied on December 8, 2006, and Beeson

requested reconsideration.  Tr. 18-23.  After the request for reconsideration was denied on

April 11, 2007, Beeson timely requested a hearing.  Tr. 13-17.  A hearing was held before

Administrative Law Judge ("ALJ") on November 6, 2008, and a supplemental hearing was held

on May 7, 2009, after the remaining medical records had been received.  Tr. 777-824.

On May 29, 2009, the ALJ found that Beeson was not entitled to SSI.  Tr. 11N.  The

Appeals Council denied Beeson's request for review of the ALJ's decision.  Tr. 6-9.  The

Appeals Council decision is a final decision of the Commissioner, subject to review by this court.

20 CFR § 410.670a.

## BACKGROUND

### I. Allegations of Disability and Daily Activities

Beeson was born in 1956 (Tr. 60) and was 49 years old on the day he filed his claim for

disability on October 11, 2006, and 53 years old on the day of his last hearing before the ALJ.

Prior to this current filing, Beeson filed two other applications for disability benefits.  He filed

his first application on July 8, 1998, which was denied, but he did not appeal.  Tr. 11C.  He filed

---

[1] Citations are to the page(s) indicated in the official transcript of record filed on April 14, 2010 (docket #14) and June 24, 2010 (docket #19).

a second application shortly thereafter but was found not disabled by the ALJ on March 7, 2000.

He appealed this decision which the Appeals Council upheld on April 24, 2002. *Id.*

The present application alleges an onset date of January 19, 2002. Tr. 11H. Beeson claims that he is unable to work because his fingers do not work well; he is bent over due to back pain and stiffness; he has difficulty moving; he has lost interest in daily activities; he has limited use of his hands and arms such that he is unable to pick up and hold objects; and he is significantly limited by anxieties and fears, and panic attacks. Tr. 75, 84, 123, 125-26. He has taken Vicodin and ibuprofen to manage the pain. Tr. 85. Significant fatigue precludes his ability to drive and renders him unable to sit for longer than an hour at a time. Tr. 87. He spends most of his time watching TV. Tr. 89. He has difficulty attending to household chores and relies on his daughter for most of them, though he is able to care for his personal needs and grooming without assistance. Tr. 86, 88.

Despite his allegations of fatigue and pain, in October 2006 he was able to complete a 900 mile round trip road trip from Madras, Oregon, to Yuba City, California, to visit his mother, either driving himself or being driven by a friend. Tr. 329-30. However, he could not provide the contact information for this friend for verification. Tr. 332. Treatment notes also indicate he has made this trip more than once. Tr. 762. Further, Beeson ran for mayor in his town in 2004. Tr. 332. Though he did not win, he was asked to serve as an advisor to the mayor. *Id.*

In November 2006, Beeson was investigated by the SSA to evaluate whether his claim was fraudulent. Tr. 324-35. He has a history of arrests for drug-related charges including theft, which, as the ALJ noted, is a crime of dishonesty. Tr. 11G, 329. In 2000, he was arrested for attempting to fill a fraudulent prescription for Vicodin. Tr. 333.

3 - FINDINGS AND RECOMMENDATION

## II. <u>Medical Records</u>

### A. <u>Emergency Room Records and Treatment Records</u>

Though Beeson alleges disability since January 2002, medical evidence in the record begins in 2003 with regular treatment notes beginning in 2004. Beeson's medical records primarily consist of emergency room visits for pain in back, shoulder, hips, and feet and breathing problems as well as incidents related to a "decreased level of responsiveness." Tr. 11I, Tr. 173-233 (Sunnyside Community Hospital Emergency Room); 234-36 (Prosser Memorial Hospital Emergency Room); 267-95 (St. Charles Medical Center); and 344-593; 651-770 (Mountain View Hospital). The following is a summary of Beeson's visits to the emergency room for his various complaints.

On December 12, 2004, Peter Brill, M.D., saw Beeson in the emergency room at Mountain View Hospital for complaints of a "decreased level of responsiveness." Tr. 547. Emergency medical services personnel reported that Beeson appeared to be faking his degree of unresponsiveness. *Id*. Dr. Brill found Beeson's general physical exam was "unremarkable" and explained that his past medical history "is significant for a lengthy documented history of drug abuse. He has been prosecuted for obtaining narcotics under false pretenses by using false names and evidently does have a rather protracted history of substance abuse." *Id.* When asked, Beeson denied taking narcotic medications and then stated that he did not like being called a drug addict and decided to leave against medical advice. Tr. 548.

Records from St. Charles Medical Center also highlight Beeson's use of methadone. Chart notes from November 2005 indicate that he was likely on narcotic withdrawal and from

January 2006 indicate that he had been taking methadone since November 2005 for chronic pain. Tr. 282-85.

On January 20, 2006, Beeson visited the emergency room presenting symptoms of a stroke. Tr. 272. The medical records contain no tests, observations, or treatment corroborating a stroke. Beeson's CT scan of his brain was normal and an EKG was unremarkable. Tr. 274-75. At this visit, Beeson was also encouraged to stop smoking. Tr. 279, 281.

In April 2006, Beeson visited the Santiam Memorial Hospital emergency room for neck and back pain and was prescribed methadone. Tr. 303-12.

In May 2006, Beeson's x-rays showed only cervical spondylosis at C3-4, C5-6, and C6-7 with disc space narrowing and no findings of acute or advanced degenerative process in the lumbar spine. Tr. 306. In April 2007 repeat x-rays of his lumbar spine showed stability with only mild gradual scoliosis, mild loss of disc height at L5-S1 and L1-2 stable. Tr. 731.

Sometime after April 2007, Beeson began experiencing symptoms of chronic obstructive pulmonary disease ("COPD"), obesity, and possible fibromyalgia.[2] Tr. 11J. On April 26, 2007, Nicholas Turek, M.D., treated Beeson in the Mountain View Hospital District emergency room and reported diagnostic imaging suggestive of early osteoarthritis. Tr. 734. But at a June 2007 examination, Beeson had full range of his wrists and fingers bilaterally and good muscle strength in his hands. Tr. 716, 734.

On July 31, 2007, Beeson saw Frank Cobarrubia, M.D., at the Northwest Foot Care because of pain in his feet. Tr. 650. Dr. Cobarrubia found that Beeson had no structural

---

[2] Beeson filed his claim in October 2005, and while his denial of benefits was on appeal, he supplemented his medical records which provided evidence for additional severe impairments of COPD, obesity and possible fibromyalgia.

abnormalities and good range of motion of all joints of his foot and ankle. *Id*. He commented that, "[w]ithout a history of fibromyalgia this seems to be a very odd presentation of a plantar fascitis, or some kind of soft tissue inflammation." *Id*.

Beeson self-reported emphysema and was prescribed an inhaler on March 5, 2007. Tr. 595. He also reported respiratory problem to Dr. Turek in July 2007 who refilled his inhaler prescription. Tr. 707, 7114. However his July 27, 2007 chest x-ray showed no active cardiopulmonary disease. Tr. 730. On August 22, 2007, Dr. Turek noted that Beeson had only mild COPD. Tr. 711. At that time, Beeson reported that he was walking approximately one mile each day. *Id*. In March 2008 Beeson reported a fall and subsequent hip pain to Leonard Savage, M.D. Tr. 705. Bilateral hip x-rays taken at Mountain View Hospital were normal. Tr. 661. According to emergency room records from April 2008, Beeson reported a history fibromyalgia and rheumatoid arthritis and using a cane for balance. Tr. 652. In May 2008, Beeson's x-rays showed progressive disc space narrowing, vertebral endplate changes at C5-6 and C6-7 and kyphosis at C5-6 with progressive vertebral endplate compression and possible erosive changes. Tr. 729. Repeat lumbar x-rays also showed facet degeneration of L5-S1. *Id*.

Since Beeson had used methadone in the past for chronic pain, Dr. Turek began prescribing methadone in May 2007. Tr. 717. He then documented a pattern of Beeson requesting additional methadone refills due to out-of-town trips. Tr. 713 (August 2007; going out-of-town for a month); Tr. 708 (January 2008; taking trip to Washington); Tr. 701 (February 2008; last refill); Tr. 760 (June 2008; taking trip to Hawaii); Tr. 764 (September 2008; taking trip to Sacramento). On November 10, 2008, when Beeson saw Dr. Turek for a refill of methadone, he was terminated from the clinic for violating his pain contract three times. Tr. 763. Dr. Turek

noted Beeson's statements that he had had his disability hearing the day before and "uses his cane because he has a lot of pain in his feet," hips, and knees and "sometimes his legs just give out on him." *Id*. Dr. Turek also noted that his COPD was mild. *Id*.

Beeson saw Dr. Turek a week later within the 30-day window of his termination for yet another methadone refill before he went to California for a few months. Tr. 762.

### B. Consultative Reports and Records

William Trueblood, Ph.D., completed a psychodiagonostic examination of Beeson in May 2006. Tr. 296-301. As a provisional diagnosis, he concluded that Beeson appeared to suffer from depression since the January 2006 stroke. Tr. 300. He noted an alternate diagnosis of Adjustment Disorder with anxiety, but that Beeson did not meet the criteria for a Major Depressive Episode. Tr. 300-01. Dr. Trueblood declined to diagnose a personality disorder, noting that it was difficult based only on Beeson's self-report. Tr. 301. Dr. Trueblood clarified that though he did not believe Beeson malingered on the evaluation, he was not certain. *Id.*

He concluded that Beeson was markedly impaired in his ability to understand and remember instructions, but conceded this could also be a moderate impairment. *Id*. He rated Beeson as moderately impaired in his ability to sustain attention/concentration ("a tentative rating") and to engage in appropriate social interaction. *Id.* However, he found no apparent problems getting along with others. *Id.*

In July 2006, Delmar Greenleaf, M.D., completed a comprehensive consultative exam of Beeson. Tr. 313-18. He observed multiple physical findings inconsistent with Beeson's neurophysiological problems which he felt "strongly supports that there was malingering and

pain behavior present during this exam making accuracy very difficult." Tr. 317. He also noted

that, contrary to the medical records, Beeson denied a history of narcotic abuse. *Id.*

Peter LeBray, Ph.D., saw Beeson in December 2006 and completed a mental RFC

assessment. Tr. 616-18. He concluded that Beeson can understand and remember simple

instructions, locations, and work-like procedures; is capable of maintaining simple, paced,

routines with regular breaks and supervision; is able to get along with co-workers and respond to

supervisory input but would do best in work environments with limited public contact; and due

to narcotic use, should avoid hazardous conditions. Tr. 618.

### C. Hearing Testimony

At the November 6, 2008 hearing, Beeson testified about the need to use his cane, his

breathing problems associated with COPD, muscle spasms in back and shoulder associated with

fibromyalgia, problems with swelling in his feet, and panic attacks. Tr. 800-12. His daughter,

Cynthia Beeson, testified that her father had trouble getting out of bed in the morning, was

frequently in pain, and has trouble remembering things. Tr. 814-15. She also testified that he

has trouble getting around, even with a cane, and will use motorized carts to assist when

shopping. Tr. 816. He gets anxious and fatigued easily. Tr. 817.

A supplemental hearing was held on May 7, 2009, after additional medical records from

Dr. Turek were received. Tr. 777-92. Beeson denied that Dr. Turek had stopped treating him

because he had violated the pain contract three times and explained that the violation resulted

because he lost his prescription. Tr. 781. Beeson also testified about his weight gain. Tr. 784.

The vocational expert ("VE") testified that given the restrictions prior to April 9, 2007, Beeson could medium level work as a hand packager (DOT No. 920.687-134)[3] and salvage parts laborer (DOT No. 929.687-022).  Tr. 789.  Given the restrictions for impairments subsequent to April 9, 2007, the VE testified that Beeson could perform light duty work as a tray setter (DOT No. 319.677-014) and ticket cashier (DOT No. 211.462-010).  Tr. 790.

## DISABILITY ANALYSIS

In construing an initial disability determination under Title XVI, the Commissioner engages in a sequential process encompassing between one and five steps.  20 CFR § 416.920; *Bowen v. Yuckert*, 482 US 137, 140 (1987).

At step one, the ALJ determines if the claimant is performing substantial gainful activity.  If so, then the claimant is not disabled.  20 CFR § 416.920(a)(4)(i).

At step two, the ALJ determines if the claimant has "a severe medically determinable physical or mental impairment" that meets the 12-month durational requirement.  20 CFR §§ 416.909, 416.920(a)(4)(ii).  Absent a severe impairment, the claimant is not disabled.  *Id.*

At step three, the ALJ determines whether the severe impairment meets or equals an impairment "listed" in the regulations.  20 CFR § 416.920(a)(4)(iii); 20 CFR Pt. 404, Subpt. P, App. 1 (Listing of Impairments).  If the impairment is determined to meet or equal a listed impairment, then the claimant is disabled.

If adjudication proceeds beyond step three, the ALJ must first evaluate medical and other relevant evidence in assessing the claimant's residual functional capacity ("RFC").  The

---

[3] "The Dictionary of Occupational Titles ("DOT") includes information about jobs (classified by their exertional and skill requirements) that exist in the national economy."  20 CFR § 416.969.

claimant's RFC is an assessment of work-related activities the claimant may still perform on a regular and continuing basis, despite the limitations imposed by his or her impairments. 20 CFR § 416.920(e); Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 (July 2, 1996).

At step four, the ALJ uses the RFC to determine if the claimant can perform past relevant work. 20 CFR § 416.920(a)(4)(iv). If the claimant cannot perform past relevant work, then at step five, the ALJ must determine if the claimant can perform other work in the national economy. *Yuckert*, 482 US at 142; *Tackett v. Apfel*, 180 F3d 1094, 1099 (9th Cir 1999); 20 CFR § 416.920(a)(4)(v).

The initial burden of establishing disability rests upon the claimant. *Tackett*, 180 F3d at 1098. If the process reaches step five, the burden shifts to the Commissioner to show that jobs exist in the national economy within the claimant's RFC. *Id.* If the Commissioner meets this burden, then the claimant is not disabled. 20 CFR § 416.966.

## ALJ'S FINDINGS

At step one, the ALJ concluded that Beeson had not engaged in any substantial gainful activity since the onset of his alleged disability. Tr. 11E.

At step two, the ALJ determined that prior to April 9, 2007, Beeson suffered from the severe impairments of cervical spine spondylosis, adjustment disorder, and rule-out cognitive disorder. *Id.* After April 9, 2007, he has suffered from the additional severe impairments of COPD, obesity, and possible fibromyalgia. *Id.*

At step three, the ALJ concluded that Beeson does not have an impairment or combination of impairments that meets or equals any of the listed impairments.  Tr. 11F.  Prior to April 9, 2007, Beeson had the RFC

> to lift and carry 50 pounds occasionally and 25 pounds frequently, push and pull 50 pounds occasionally and 25 pounds frequently, stand and/or walk for six hours per eight hour work day, and sit for six hours per eight-hour work day.  He was limited to occasional climbing of ladders, ropes, or scaffolds, and should have avoided working around hazards and respiratory irritants.  He was limited in understanding, but could perform one to three step tasks with no more than occasional public contact.

Tr. 11G.

After April 9, 2007, Beeson had the same RFC except that he could "lift and carry 20 pounds occasionally and 10 pounds frequently, push and pull 20 pounds occasionally and 10 pounds frequently."  Tr. 11J.  The ALJ further concluded that Beeson's allegations were not credible.  Tr. 11G-11L.

At step four, the ALJ found that Beeson did not have any past relevant work.  Tr. 11L.

At step five, the ALJ concluded that considering Beeson's age, education, and RFC prior to and after April 9, 2007, he was capable of performing the unskilled, medium jobs of a packager (DOT No. 920.687-134) and salvage parts laborer (DOT No. 929.687-022).  Tr. 11M.  The ALJ also concluded that Beeson's RFC after April 7, 2009, allowed him to perform the unskilled, light jobs of a tray setter (DOT No. 319.677-014) and ticket cashier (DOT No. 211.462-010).  Tr. 11M.  Accordingly, the ALJ concluded that Beeson was not disabled at any point through the date of the ALJ's decision on May 29, 2009.  Tr. 11N.

## STANDARD OF REVIEW

The reviewing court must affirm the Commissioner's decision if the Commissioner applied proper legal standards and the findings are supported by substantial evidence in the record.  42 USC § 405(g); *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F3d 1190, 1193 (9th Cir 2004).  This court must weigh the evidence that supports and detracts from the ALJ's conclusion. *Lingenfelter v. Astrue*, 504 F3d 1028, 1035 (9th Cir 2007), citing *Reddick v. Chater*, 157 F3d 715, 720 (9th Cir 1998).  The reviewing court may not substitute its judgment for that of the Commissioner.  *Id*, citing *Robbins v. Soc. Sec. Admin.*, 466 F3d 880, 882 (9th Cir 2006); *see also Edlund v. Massanari*, 253 F3d 1152, 1156 (9th Cir 2001).  Variable interpretations of the evidence are insignificant if the Commissioner's interpretation is a rational reading. *Lingenfelter*, 504 F3d at 1035; *Batson*, 359 F3d at 1193.

## FINDINGS

Beeson challenges the ALJ's evaluation at step five based on three errors:  (1) improperly determining Beeson's RFC; (2)  failing to consider the impact of Beeson's obesity on his ability to work; and (3) relying on erroneous VE testimony.

## I.  RFC

Beeson argues that the ALJ's RFC conclusion lacked supporting medical evidence.  He argues that for the period prior to April 9, 2007, the ALJ relied only on opinions by state agency physicians, rather than on treating physicians and that After 9, 2007, failed to solicit any opinions to ascertain the extent of Beeson's workplace limitations despite the three additional severe impairments of COPD, obesity and possible fibromyalgia. Tr. 11E-11F.  He argues that the ALJ

improperly omitted Dr. LeBray's determination without any reason and improperly evaluated his obesity.

A person's RFC is the most he can still do despite his limitations. 20 CFR § 416.945(a)(1). It is that individual's "*maximum* remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, *2 (emphasis in original); 20 CFR § 416.945 (b), (c). "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p, 1996 WL 374184, *1. In assessing an individual's RFC, the Commissioner must consider all of a claimant's medically determinable impairments, whether severe or not, and all the relevant medical and other evidence in the record. 20 CFR § 416.945(a)(2)-(3). The RFC determination is based on "all of the relevant medical and other evidence," including any statements about what the claimant can still do provided by medical sources, whether based on a formal medical examination or not, and descriptions and observations of a claimant's limitation from his or her impairments provided by the claimant or his or her family, neighbors, and friends. 20 CFR § 416.945(a)(3); *see also*, SSR 96-8p, 1996 WL 374184, *5. The ALJ must "consider all allegations of physical and mental limitations or restrictions and make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC." SSR 96-8p, 1996 WL 3714184, *5.

As a threshold matter, it is important to note that the ALJ found Beeson not credible based upon his activities of daily living, his pattern and behavior of drug seeking and secondary gain, medical findings that did not support his alleged limitations, his arrest for attempting to fill

a fraudulent prescription of Vicodin and other arrests for drug-related charges and theft, and

malingering and pain behavior.  Tr. 11G-11J.  Though Beeson does not contest these findings,

the ALJ's credibility determination was material to his RFC findings.  Tr. 11J.

### A.  Prior to April 9, 2007

Beeson generally alleges that the ALJ determined his RFC without any medical evidence

and relied only on state agency physician opinions for the period prior to April 9, 2007.    The

ALJ's opinion shows otherwise.  Beeson was seen primarily by emergency room doctors and had

no primary care physician.  These include non-state agency doctors, namely Drs. Brill, Jensen,

Kenny, and Stringham.  Tr. 11I, 547, 643, 272, and 303.  They treated him for his complaints of

shoulder pain and also noted his requests for narcotics.

Beeson's argument that the ALJ failed to include all of Dr. LeBray's restrictions,

specifically the restriction of "paced" work, lacks support.  Dr. Lebray determined that Beeson

was moderately limited in two of the eight skills in "Sustained Concentration and Persistence"

category (ability to carry out detailed instructions and ability to maintain attention and

concentration for extended periods) and not significantly limited in the other six.  Tr. 616.  In his

narrative description,[4]  Dr. LeBray stated that Beeson was "[c]apable of maintaining simple,

paced, routines with regular breaks and supervision."  Tr. 618.

The RFC determination is not a medical issue, however, and the final responsibility for

this determination is within the province of the Commissioner.  SSR 96-5p at *2.  In any event,

the ALJ did not ignore Dr. LeBray's restrictions, but specifically found that Beeson had moderate

---

[4]  Defendant argues that there was no error as the ALJ properly concentrated on the narrative conclusion.
However, the narrative does specify "paced" work which was not addressed in the RFC.

difficulties in "concentration, persistence or pace."  Tr. 11F.  He also incorporated this restriction in the hypothetical to the VE by describing an individual with the following  non-exertional impairments:  "limitation to understanding, remembering and carrying out simple instructions, simple *paced*, routine work.  We're talking one, two three steps."  Tr. 788 (emphasis added).  This description is consistent with Dr. LeBray's narrative description of Beeson's limitations.

**B.  Under April 9, 2007**

Beeson argues that the ALJ erred by soliciting no physician opinions to ascertain the extent of his limitations for his RFC after April 9, 2007, based on the additional impairments of COPD, obesity, and possible fibromyalgia.

Though Beeson suggests other physicians should have been solicited for the RFC determination, he does not argue that the ALJ failed to develop the record.  Even so, the ALJ's duty to develop the record is triggered when the doctor's report is ambiguous or insufficient to make a disability determination.  *Bayliss v. Barnhart*, 427 F3d 1211, 1217 (9th Cir 2005).  That duty was not triggered here since the ALJ simply did not find Beeson credible.

The ALJ's opinion confirms that, to the extent he found Beeson's related allegations credible, he did consider these additional impairments:  "Considering these changes, in addition to [Beeson's] other diagnoses as represented in the record since April 2007, the undersigned finds that the above residual functional capacity for light work is appropriate for that date. . . . [Beeson's] allegations are not found credible."  Tr. 11L.  He also specifically considered the opinions of treating physicians, Drs. Turek, Cobarrubia, and Savage.  Tr. 11J-11L.

The ALJ determined that while the medical notes indicate fibromyalgia, the record contained "no other corresponding findings in support of such a diagnosis, and it is unclear whether this diagnosis is based on [Beeson's] self-report." Tr. 11J. The record fully supports that finding. The ALJ also found no corroboration for Beeson's reported rheumatoid arthritis, noting that it "does not reflect any findings of joint swelling to indicate such a diagnosis, and does not include testing for a positive rheumatoid factor." Tr. 11K. As Dr. Turek found, Beeson possibly had early osteoarthritis, but had full range of motion of his wrists and fingers bilaterally and good muscle strength in his hands. Tr. 716.

Though Beeson reported to Dr. Turek that he used a cane, the ALJ correctly noted that Dr. Turek provided no objective basis for Beeson to use a cane. Tr. 11K. In addition, Beeson's reminder to Dr. Turek about the cane was the day after the hearing when the ALJ generally questioned Beeson about his need to use a cane. Tr. 801. As the ALJ appropriately concluded, "the findings on examination are generally mild, failing to corroborate [Beeons's] need for a cane, and illuminating another example of [his] manipulative behaviors in pursuit of his claim for disability benefits." Tr. 11K.

Regarding the alleged COPD impairment, the ALJ accurately found that "in contrast to [Beeson's] self-reported diagnosis of emphysema, a chest x-ray in July 2007 showed no active cardiopulmonary disease." *Id*. The ALJ further noted that Beeson reported to Dr. Turek that he was able to walk a mile a day and denied having any shortness of breath in 2007. Tr. 11K, 711. Dr. Turek also consistently described that Beeson's COPD as mild. Tr. 704, 711, 763.

The ALJ also reviewed Dr. Cobarrubia's records of Beeson's foot complaints.  In July 2007, Beeson presented with bilateral foot pain though x-rays did not show any fractures or dislocations.  Tr. 11J, 650.  Dr. Cobarrubia found no structural abnormalities and commented, "without a history of fibromyalgia this seems to be a very odd presentation of plantar fasciitis, or some kind of soft tissue inflammation."  Tr. 650.

Based on his credibility evaluation, the ALJ rejected Beeson's allegations of symptoms and fully considered the medical record in formulating the RFC.  The record contains substantial evidence supporting this RFC determination.

### C.  Obesity

Beeson argues that the ALJ erred when he failed to address the limitations of his obesity in his RFC.  The SSA recognizes that obesity can cause limitations of function, with the actual limitations dependent on various factors specific to the individual.  SSR 02-1p at *6.  "An assessment should also be made of the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment. . . .  In cases involving obesity, fatigue may affect the individual's physical and mental ability to sustain work activity."  *Id.*  However, the SSA:

> will not make assumptions about the severity or functional effects of obesity combined with other impairments.  Obesity in combination with another impairment may or may not increase the severity or functional limitations of the other impairment.  We will evaluate each case based on the information in the case record.

*Id*.

The claimant has the burden of providing evidence as to how his obesity limits his functioning. *Burch v. Barnhart*, 400 F3d 676, 683 (9th Cir 2005).

Although the ALJ found that Beeson suffered from the severe impairment of obesity after April 9, 2007, he did not include any functional limitations related to obesity in the RFC or in the hypothetical posed to the VE. However, Beeson did not allege any limitation based on his obesity and provided no evidence as to how it impacts his ability to work. Records after April 9, 2007, reveal that he asserted a disability based only on heart problems, liver damage, back pain, anxiety, depression, and stroke. Tr. 75, 620, 636. His medical records primarily deal with the pain in his shoulder, legs, and breathing problems. While it is possible that these conditions were exacerbated by obesity, Beeson made no allegation as to how his weight has limited his functioning. The ALJ is obligated to evaluate only the evidence presented in the case record and did not err by declining to include limitations in the RFC related to obesity.

## II.  VE Testimony

Beeson argues that the VE's testimony in response to the first hypothetical question was erroneous because the jobs were identified incorrectly by title or description of the core functions and because specific limitations ruled them out. He argues that the VE's testimony in response to the second hypothetical question also was erroneous because his limitations preclude the identified jobs.

At step five, the Commissioner must show that the claimant can do other work which exists in the national economy. *Andrews v. Shalala*, 53 F3d 1035, 1043 (9th Cir 1995). The Commissioner can satisfy this burden by eliciting the testimony of a VE regarding what jobs the

claimant would be able to perform, given his RFC. *Tackett*, 180 F3d at 1101. An ALJ must propose a hypothetical that sets forth all the reliable limitations and restrictions of a claimant that are supported by substantial evidence. *Roberts v. Shalala*, 66 F3d 179, 184 (9th Cir 1995). The hypothetical must be "accurate, detailed, and supported by the medical record." *Tackett*, 180 F3d at 1101. "If a hypothetical fails to reflect each of the claimant's limitations supported by 'substantial evidence,' the expert's answer has no evidentiary value." *Osenbrock v. Apfel*, 240 F3d 1157, 1167 (9th Cir 2001), citing *Gallant v. Heckler*, 753 F2d 1450, 1456 (9th Cir 1984).

The first hypothetical question pertained to the RFC for Beeson's abilities prior to April 9, 2007, and described an individual who was able to:

> lift and carry 50 pounds occasionally and 25 pounds frequently, push and pull 50 pounds occasionally and 25 pounds frequently, stand and/or walk for six hours per eight hour work day, and sit for six hours per eight-hour work day. He was limited to occasional climbing of ladders, ropes, or scaffolds, and should have avoided working around hazards and respiratory irritants. He was limited in understanding, but could perform one to three step tasks with no more than occasional public contact.

Tr. 11G.

The second hypothetical question concerning Beeson's abilities after April 9, 2007, presented the same RFC but with an ability to "lift and carry 20 pounds occasionally and 10 pounds frequently, push and pull 20 pounds occasionally and 10 pounds frequently." Tr. 11J.

### A.  **Hand Packager and Salvage Laborer**

The VE testified that Beeson could perform the tasks of a "packager, a hand packager, 920.687-134 is the DOT number, SVP two, and simple and routine work at a medium exertion level." Tr. 789. Beeson argues that this position is inconsistent with the DOT, as "hand

packager" is actually DOT No. 920.587-018.  The DOT number cited by the VE is for an

agricultural produce packer.  Beeson argues that this misstatement establishes that no evidence

existed to determine what job the VE actually testified about.  Even if the VE provided the

incorrect DOT number for the hand packager job, her description of the hand packager job is

consistent with its DOT listing, namely medium level of work with a Specific Vocational

Preparation ("SVP") level of two.  The VE also described this work as simple and routine.  These

traits correspond with the restrictions in the first hypothetical question.

Beeson also argues that the hand packager, packer, and salvage laborer positions are

inappropriate because they require more than three-step tasks, specifically 19 for the packer, 23

for the packer, and 11 for the salvage laborer.  While the descriptions for each list more than

three tasks to perform, performing all of the tasks is not required.  The hand packager,

"[p]ackages materials and products manually, performing any combination of following

duties . . ." (DOT No. 920.587-018, 1991 WL 687916 (GPO)); the packer, "[p]acks agricultural

produce . . . performing any combination of following duties," ( DOT No. 920.687-134, 1991

WL 687994 (GPO)); and the salvage laborer, "[s]alvages materials in industrial or commercial

establishment, performing any combination of duties" (DOT No. 929.687-022, 1991 WL 688172

(GOP)).  Further all positions are SVP level 2, which is consistent with the Commissioner's

definition of simple work.  20 CFR § 416.968(a); SSR 00-4p at *3.

Beeson also argues that these positions are inappropriate because they violate the

hypothetical's "no hazard" restriction.  The packager "[n]ails, glues, or closes and seals

containers."  DOT No. 920.587-018.   The packer "[f]its lid on container with nails, wires or

tapes in place.  Stamps grade, brand, and date of packing on container.  Washes and trims

produce . . . working in a warehouse or on harvesting machine in field."  DOT No. 920.687-134.

The salvage laborer "[m]akes minor repairs to scrap containers, such as bumping out dents, using

handtools."  DOT No.929.687-022.   As noted previously, however, the individual performs any

combination of, and not all of, the duties in the description.  Not all positions require an

individual to perform hazardous duties.

  **B.** **Tray Setter and Cashier**

  Beeson argues the cashier position is inappropriate because its primary function requires

public contact and the job description involves the performance of 15 consecutive tasks.  He also

argues the tray setter position is not appropriate because it requires the individual to lift more

than 20 pounds occasionally and 20 pounds frequently, which are Beeson's limitations.  The

Commissioner concedes that the tray setter position was inappropriate for Beeson.

  As to the cashier position, however, the Commissioner argues it is consistent with the

ALJ's hypothetical.  The cashier description lists several forms this position may take, including

clerical, office cashier, or floor cashiers.  DOT No. 211.462-010, 1991 WL 671840 (GPO).  Not

all forms have more than occasional public contact.

  Even if it the VE testimony did contradict the DOT, "[a]n ALJ may rely on expert

testimony which contradicts the [DOT so long as] the record contains persuasive evidence to

support the deviation."  *Johnson*, 60 F3d 1435-36.  Substantial evidence in the record supports

the ALJ's finding that Beeson can perform this job even with his limitations of anxiety in public

and inability to get along with others, given that these limitations did not inhibit Beeson from

campaigning for public office or his willingness to serve as an advisor to his city's mayor. Tr. 11H, 332.

As to the consecutive job tasks, the description does not require an individual to perform all of the tasks.  The cashier, "[r]eceives cash from customers . . . [a]nd records amount received: Recomputes or computes bills, itemized lists, and tickets showing amount due, using adding machine or cash register.  Makes change, cashes checks, and issues receipts or tickets to customers.  Records amounts received and prepares reports of transactions.  Reads and records totals shown on cash register tape and verifies against cash on hand."  Other job tasks are not mandatory but are optional as indicated by "may be required" or "may operate" language.  The VE's testimony is not inconsistent with the DOT.

Thus, the ALJ did not rely on erroneous VE testimony when he determined that there existed jobs in the national economy Beeson could perform given his RFC.

## RECOMMENDATION

For the reasons discussed above, the Commissioner's decision should be AFFIRMED and the case DISMISSED.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge.  Objections, if any, are due January 24, 2011.  If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 6th day of January, 2011.

s/ Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge